or the last case of the morning, unless I hear objection from colleagues. No objection. I think I heard the word no at the beginning of that. Yes, there was a no. Yes, there was a no. All right, last case of the morning, Jennifer Harkey v. NextGen Healthcare. We're ready to proceed. Good morning, your honors, and may it please the court. My name is Andrea Mehta, and I, along with my co-counsel Mason Dunham, am here on behalf of Ms. Jennifer Harkey, who is the appellant in this case. This case is troubling for several reasons. The wholesale disregard and misapplication of the summary judgment by the district court has unsettling ramifications for future cases. Moreover, the district court endorses pre-ADA Amendments Act standards when it interprets the evidence and it held Ms. Harkey to an outdated standard of proof. Third, the district court erred in applying misconduct in the workplace cases to a situation where a woman was not acting consciously, was not in the workplace, and was sleepwalking. Her actions were wholly as a result of a sleepwalking disorder. And so, misconduct in the workplace line of cases have no application there. Turning to this issue with respect to the summary judgment misapplication, it's difficult to know where to begin when the district court's opinion is so rife with misapplication of the standard. If you even look at the first page, the background section of the district court's opinion, there are the citations to that record, there's about 13. The court cites to the defendant's motion for summary judgment. It is one page, single space, this background section of facts. Ms. Harkey presented seven single space pages of summary judgment facts supported by 85 footnote references which had record sites. And the district court blatantly disregarded this evidence. Now, given time limits, of course I can't go through each of them. Well, let me ask you, it's de novo review summary judgment, so for a second let's forget about the district court opinion. Yes, sir. To me, the hard issue is whether your client had a disability, which means that this sleepwalking substantially limited one or more major life activities. And I think everyone agrees sleeping is a major life activity. But the cases I see finding a sleeping-related disability are, say, insomnia cases where you're not sleeping like most normal people do, so you're tired all day at work. I mean, how did this limit, I don't see any evidence of that, though, that this caused her to act differently the next day after a sleepwalking incident. What is the evidence and the best cases to show why this impaired a major life activity? Your Honor, one of the most analogous cases, actually, is this court's opinion in canon, which involved a shoulder injury. Yeah, I wrote that, I know that one. In that case, as Your Honor knows, there was evidence that despite this rotator cuff injury, the plaintiff still could go on with his regular activity, could work. And this court said that's not the relevant question. The question is, is the plaintiff substantially impaired as compared to the rest of the population? And we articulated that standard to the court. And with respect to what— With a rotator cuff, I mean, clearly you are impaired. I mean, people who don't have a rotator cuff can lift things, et cetera, easier than someone with a rotator cuff. How did this—it's not insomnia, it's not like she's not rested in the morning. How is this affecting her daily functioning, I guess, is my question. Well, Your Honor, it's affecting her major life activity of sleep because it's causing her to walk around in a non-conscious state. And so, respectfully, I would articulate the correct test is— Once in, like, the last 10 years or something? She's been a sleepwalker for her entire life. It's sporadic, correct. It is sporadic. And it did happen 10 years prior to the incident in question and happened more frequently when she was a teenager. But, Your Honor, the question is— I didn't understand what you just said. Is there one incident that has been stated to have existed in the record in the last 10 years and several more before that? Yes, Your Honor. I didn't quite hear. Yes, Your Honor. So she is an infrequent sleepwalker, but she had episodes when she was a teenager. She had the recent episode 10 years prior. She had another sleepwalking episode. To answer Judge Costa's question with respect to what's in the record, the fact that she has her testimony saying that this disorder causes her to walk around in a non-conscious state and to move chairs, to walk around, to enter in potentially dangerous situations. In this case, it caused her to walk into another—to knock a door. That in and of itself, when you compare to the general population, it's common knowledge that when we sleep, we don't sleepwalk. And the Code of Federal Regulations, 1630.2J145, discusses that when you're wanting that comparison with the general population, you don't need statistical evidence. So, so many precedent after precedent of this court has held her testimonies enough. And our perspective is the district court erred because it used an improper standard. It looked at, well, she can work. She's able to work. And this court said in canon, this court said in Williams, that that's not relevant. Her ability to work is not the question because you can be limited in one major life activity but not another. Excuse me, let me ask you. But, excuse me. Go ahead, Judge Stoffik. You're at a disadvantage from seeing what's going on here at the bench. Why don't you go ahead and I'll pick up after you finish. Well, thank you. Thank you, Judge Stoffik. I appreciate the courtesy. I can't tell, though, how it could be an interrupted major life activity with only one incident. Is there any case that says it's such a rare interruption is a major life activity? And then also my second question, which is how do you distinguish the Hamilton Green line of cases? You know, the idea that if a person with Tourette's has outburst, that still, that he can be fired even for the outburst, not for the disability. So, can you deal with both of those questions? Yes, Your Honor. With respect to the first question of whether one incident is enough, this court's cases and the ADA regulations and the ADA itself don't talk about a specific number of instances that are necessary. In fact, in regarded as cases, it's enough that they suspected, they thought she had this impairment and they acted on that behalf. And so, what we would articulate is there's no minimum amount of episodes for protection under the ADA. The question is in terms of whether she's substantially limited in a major life activity should not demand extensive analysis. And we posit that the district court just did away with any of her evidence and said because she can work, she's not substantially impaired. Now, with respect to Hamilton, I'm glad you brought that up. That was actually one of the things I wanted to cover, Your Honor. Hamilton and its line of cases discusses misconduct in the workplace. And Hamilton involved a man who had arguably PTSD, he said. He was cursing. He entered into a physical altercation with a coworker. He put that individual in fear. And because of that, this court said that the ADA does not allow you to use that accountability as a shield. You can't use the ADA as a shield for accountability. But common sense dictates when the record shows that there was no intent, that she wasn't even awake. It is unfathomable to extend that line of cases to a situation. Wait a second. It's not about the person who's the recipient. He was certainly in fear. He was in fear that he was going to be accused of some untoward actions, et cetera. He was definitely in fear. So the Tourette's case, though, if the person has no control over that, the same way, but still there are outbursts or there's a vulgar outburst in that case, we're allowed to fire over that in the case law. So can you help with that? Respectfully, Your Honor, I would say that the summary judgment evidence has a fact question as to why this employee was in fear. Because NextGen's own employee was interrogating him as if a sexual assault incident had occurred. There was a co-worker in his room at, what, 1 in the morning? I mean, I don't think it's strange that he'd be very concerned about that situation. Completely understandable, Your Honor. But also, while NextGen at the summary judgment level said she barged in the room, she knocked on the door. He didn't look. He opened it. He stepped back to let her in. And there are repeated inferences in the record. He wanted to call his attorney at 3 a.m. because specifically he says, I thought I was accused of doing something I didn't do. That came from Jill Burke's questioning. Jill Burke is NextGen's employee. So the jury can decide between those two versions, correct? They can decide why was he really in fear. But the question is, this woman, he admitted he did not feel sexually harassed. She didn't look at him. She didn't speak to him. She didn't touch him. Your Honor, she was asleep. And we are venturing into dangerous territory. But the real question is, can't the company, I mean, has a legitimate concern about potential harassment allegations. Can't they do something about that? Even if, sure, in this case there was no evidence that it actually was that type of incident. But it kind of looked that way. And why can't the company, aren't we interfering with companies' ability to make sure they maintain vigilant policies against sexual harassment when people are at conventions or in the workplace? Your Honor, respectfully, I don't believe that you are in this case because of the additional evidence before this court. And this court has said in the Shake v. Texas A&M case, which is a title, it's a Rehabilitation Act case. But as this court knows, ADA is instructive in those cases. That it's a false equivalency to say that there is no line between disability-caused conduct and the disability. Because if you go down that route, you are taking away the protections meant by the ADA. And the misconduct in the workplace cases really operate as more of an extension of those line of cases. This is not a case where she was at, after the fact, trying to excuse it. Everyone witnessed the sleepwalking in action. And one thing that's very important to your point, Your Honor, is you have a fact issue where an employer is saying you're a liability. And this court has held in Laxton, when you have evidence of discriminatory animus and a decision maker, those statements are relevant as a pretext. What's more, this is not that this employer was just worried, oh, about misconduct. They told her, Your Honor, to see a doctor. The next morning, they told her, see a doctor. They terminated her hours after she had that same doctor's appointment. So this is very much an issue where there is a lot of evidence that shows that they had a discriminatory animus. And this court has held, even in the pre-ADA Amendments Act context, in the Rodriguez case, yeah, an employer can be worried about potential liability for an uncontrolled disability. An employer can't make snap decisions based on a disability because that's disability discrimination. An employer can't say, I'm worried that this is for the best of the company because I'm going to be liable if your disability is out of control. NextGen didn't even enter into any sort of interactive process when they witnessed, Your Honors, I can't stress that enough, they witnessed this disability in action. This is a case where no one was hurt. The arguable harm to Mr. O'Donnell stemmed from NextGen's questioning and treating it like a sexual assault incident. When it had not happened. Now, the question... Let me ask you this, counsel. I know you've already taken a run at Hamilton. If you add the fact to Hamilton that existed in this case, you, employee, who engaged in these profane outbursts because of a condition. You, employee, are a liability. Would that have changed the outcome of that case? Does that raise an issue, really a motive, a pretext? Or does it just state a reality that could very easily be a fact in both of those cases? But does it change the outcome? And if not, why isn't the same outcome proper here? Your Honor, with respect to PTSD, that disability manifests itself in many ways. And the outburst was, he says it was caused by his disability. Here, there is no segregation. You seem to be making some argument that maybe factually it wasn't? The PTSD in Hamilton? No, I'm saying that at that... The question is, what's the causation, correct? What made the employer make that decision? Was there enough for there to be a fact question? Because you have an objectively violent act in the workplace. You can see that an employer's interest in protecting the workplace can give rise to being able to terminate. It's a uniform application. Here, you have a 10-year exemplary employee. NextGen's own policy says that they consider factors such as intent, isolation, mitigating circumstances. And all of these factors weigh in favor of not terminating an employee who had even just received a promotion. So this is a case, Your Honor, where we are asked... The district court is applying misconduct to something that is unconscious. It's not just that she can't control it. She was asleep. She was not awake. This was not a manifestation. This was her disability in action. So why isn't that exactly the same thing as the Tourette's case in the Roy v. Kroger with the 11th Circuit, which is followed Hamilton? But it seems to me that why is... I brought this up because it's about time, and I don't think you directly addressed why isn't that situation... Are you saying that case is wrong, too? Or do you think that there's some distinction between a person with Tourette's that cannot control a vulgar outburst? And, Your Honor, I'm not saying that that case is wrong, and I'm not saying Hamilton is wrong. I'm saying it shouldn't be extended. There's a question of violent, vulgar... There's a distinction, absolute distinction, between violent, vulgar outbursts and threats of several NextGen's cases. And I see I'm about to be out of time. May I finish this question? Yes. Several of NextGen's situations deal with egregious conduct. And in this court's opinion in Hamilton, the court specifically talked about workplace violence and egregious conduct. Our position is the reason this case is different is this is not egregious conduct. This is unconscious sleepwalking. And you have to view everything through the prism of the summary judgment standard. She knocked on the door, and he opened it, Your Honor. She knocked on the door. And so there is no parallel between this. Respectfully, there is no parallel between this case and Hamilton. Can I ask a question, Michelle? Forget the violence. I get the violence. Why is profanity so much more egregious than walking in someone's room very late at night? Your Honor, respectfully, she didn't look at him. She didn't touch him. She didn't say anything to him. She was asleep, and she would not have gotten entry in that room unless he opened the door. I guess my point is I think a lot of workplaces every day you'll hear profanity. This is quite an unusual situation. And respectfully, it is. People were up in the middle of the night. HR was up in the middle of the night. We're in a sexual harassment issue going on. Correct, because of her disability. Now, a jury may look at this respectfully, Your Honor. A jury may look at this and think that NextGen acted properly. The question is, is there enough to raise a fact issue? And in conjunction, in misconduct alone, this misconduct when there's no intent, that should not foreclose a jury question. And Ms. Harkey's not asking this court to say she wins. She's asking this court to not extend precedent to foreclose her ability to present a case to a jury when she has raised a fact issue that NextGen considered her conditional liability. Thank you, Your Honors. I look forward—oh, I'm sorry. Judge, did you have— I'm not going to extend the argument now, but I will ask opposing counsel, and you can mull it over, too, for rebuttal. Is this really a fact question here, or is it a legal question? It seems to me the facts are undisputed as to the company's concern about the event and knowledge by the time the decision was made what had prompted it. Is it really a fact question, or is it a legal question of whether that constitutes an ADA violation or not? Don't respond at this time. Thank you. May it please the court. Counsel. Good morning. I certainly won't go through a detailed rendition of the facts. Obviously, the court is very well aware of what happened here, and I agree with you, Judge Southwick, that the salient, the important facts that really matter here really aren't much in dispute. We believe that the district court didn't err, and in a de novo review, we don't believe that this court would err in finding that summary judgment is proper for several reasons. Notably, we don't think that the plaintiff in this case was able to establish the prima facie case either as disabled or with a record of a disability or regarded as. I want to point out— Counsel, when you said that the district court didn't err, you mean in its ultimate decision you recognized that the district court cited all kinds of things that are not summary judgment, things that they are contested, and included them as uncontested things. So the order has errors, doesn't it? The order is relatively brief. I'll grant that, and I'll also point out that while the court had some citations that would make it look like there was some reliance on pre-ADAA law, the court also cited in its opinion, cited canon, as a matter of fact, and addressed the fact that the standards have been relaxed under— So what is your answer to my question? Do you believe that the district court opinion contains errors, or do you believe it does not contain errors? I'm sorry, Your Honor, I couldn't hear that. Do you believe the district court opinion contains errors, it's just not the ultimate conclusion, or do you believe it does not contain errors? I believe it does not contain errors. I believe they reached the correct decision. The court did cite the correct standard under 29 CFR, section 1630.2. The real issue, is there a true disability? Obviously, sleeping is a major life activity as listed in the ADAAA, and the issue here, which the court has very clearly identified, is whether the testimony as provided in the summary judgment record really establishes whether there was any significant or substantial restriction on Ms. Harkey's ability to sleep. I would like to point out the following facts that are clear in the record. Ms. Harkey said she had maybe five to ten instances that she knew of, of sleepwalking in her life. The last one she was aware of was eight years prior. She was working for NextGen at that time, and I believe her testimony was that someone at a hotel front desk told her they'd seen her wandering around out in the hall. But consider these other things. She'd never seen a doctor for it. She'd never been diagnosed with any sleepwalking disorder. She'd never requested any accommodation. She had traveled extensively. Is it, in your view, is it the frequency with which she sleptwalked, or is it just that sleepwalking itself doesn't impair a major life function? Judge Costa, I think that'd have to be a case-by-case consideration. By any trier of fact, if someone sleptwalked so regularly that they were regularly injuring themselves and it affected their ability to sleep, that might be one thing. In this case, taking Ms. Harkey's testimony, as this court must, is true. It didn't bother her sleep at all. She said she didn't wake up the next day feeling tired. Most of the time didn't even know she did it, or she just had some fuzzy dream. It was very, very sporadic. And so I think it's not so much sleepwalking per se. It's how Ms. Harkey's sleepwalking manifested itself. But the sleepwalking did lead to this major problem that an ordinary person who doesn't have a sleepwalking problem wouldn't have ended up in a co-worker's room. I think that's their argument for why it's a tough issue. And I'm going to address it. I can address it now, or I can go ahead and finish the other part of it. But again, the big issue in this case, as next gen sees it, is the fact that we can establish that she was discharged for the behavior, not for the condition, which I will come to in a moment. But we believe here that when you consider the testimony that was before the district court and before this court, it's clear that this was not a disability. There's certainly no record of a disability. She'd never seen a physician for this. She'd never notified next gen that she sleepwalked, needed no accommodation. She hasn't needed an accommodation since she's not next gen anymore. I would point out that in the EEOC case handling manual, to have a record of case, there has to be evidence that the employer considered the record of a disability. There's not any evidence of that here. I believe regarded as would be the most likely way this court would find that she was covered. Again, under the ADAAA, you have to show that there is a perception that the plaintiff is disabled. Here, I think this is where the plaintiff really falls. The reason is because they tried to rely heavily on the fact that there was knowledge on Ms. Burke's part that Ms. Harkey sleptwalked because when Ms. Burke finally managed to rouse her in Mr. O'Donnell's room, one of the things that Ms. Harkey allegedly said was, I may be sleepwalking or something like that. Knowledge in itself, we've cited the Ariza case and the Austin cases that show that simple knowledge itself is not sufficient. But I think more importantly is the issue of the transitory and minor nature of Ms. Harkey's sleepwalking. And I think that if we look at the Willis case, which was issued by Judge Robinson, it does a very nice job taking the 29 CFR 1630.2 considerations and looking at them, particularly duration and long-term impact. Now, in that case, you had an employee who was suffering from dehydration and heat stroke, but it was serious enough that he had to go to the emergency room. But it was something that he recovered from very quickly, didn't need to have any follow-up treatment, no long-lasting impact. And when you compare that to the present case, again, Ms. Harkey did end up going and seeing a doctor. I believe the record evidence is that she didn't see the doctor until after she was discharged, but had notified Ms. Burke that she was going to see the doctor. But that doctor found, and this is in the record, that she experienced sleepwalking. He didn't recommend any treatment. Suggested that she consider a sleep study, which she didn't do. And she hasn't gone and seen the doctor again, and she hasn't needed any treatment for it after that. So this was a very sporadic, brief episode, and again, left her really with no personal impact. When you look at that and compare it to some of the statements that have been alleged that would, from the plaintiff's viewpoint, create a fact issue, I think that it doesn't really hold up. And I will address those presently, but we believe that the first element, establishing coverage, can't be gleaned from this summary judgment record. The second element in terms of qualification wasn't addressed and isn't an issue in the case. We believe where the plaintiff's case really falls is on the third element, which is fired because of a disability. And here, again, I think, Judge Southwick, you've foreseen what my issue would be here, and that is that the dispute really is one of law. I don't think of it rather than fact. And I say that because the appellant cites three cases in their briefing. The Ward case, I hope I'm saying this correctly, the Scheich case, and the Smith case, Scheich being the Title II case. All three are similar in one important aspect, and that is where you have a long dialogue going on of requests for accommodation, back and forth, failure to perform, which is attributed by the plaintiff to why they're not performing. In Ward, it was someone who had arthritis and was having tardiness problems, and she had asked for accommodations over some period of time, particularly in the Smith case, where someone who was hearing impaired had asked for a number of accommodations. She didn't get them, and that affected her performance, and they were fired for performance, or in the Scheich case, not allowed to sit for exams in medical school. Those are all failure to accommodate cases. They are cases where there's a long dialogue regarding the need for accommodation. They are inapplicable to this case. We believe the cases that are applicable cited by us, the Hamilton case is a good example, the Lautinger case. I'm glad, Judge Elrod, that you brought up the Ray v. Kroger company case because I felt all along it was going to be one of the most instructive cases. They talk about intent, and the court is correct, first off. Whether Ms. Harkey had intent or didn't have intent, the real issue that you see in the EEOC case handling manuals and sexual harassment training is the perception by the person who is affected by the perpetrator, not the perpetrator's intent. If that were the case, a lot of people could get away with sex harassment. I didn't mean anything by that. That doesn't float anymore. In this case... Why can't the Tourette's and the PTSD cases be distinguished? Someone with Tourette's, they can't control it, but it's going to be a daily problem in the workplace. That's going to be offensive on an almost daily basis. PTSD can cause outbursts fairly regularly. Here, the argument that maybe it's a problem for her on disability, but why isn't it the fact that this is so rare and usually happens at night when she's not at work? How is this really going to be impacting the workplace on a regular basis that would justify getting rid of her along the lines of a Tourette's situation? I'm not trying to be flipped by saying this, Judge Costa, but how much freaking out of your coworkers is allowed? In case, look at the Ray case. The gentleman had been employed there for some period of time. He carried with him a card when he would have these outbursts where if he offended someone or appeared to, he could show them the card and hopefully explain the situation away. His request of accommodation was to ask people to please understand. But eventually, when he blurted out a particularly egregious racial slur around a minority contractor, the company basically took the position that I'm having to fire you because of the conduct, not the condition. And that's why I think because of the intent issue raised by the appellant, that's why the Ray case is so instructive in this situation. But there have been a number of cases. Hamilton, Lautinger, the Birch case. We all know the Birch case, where you had somebody who had depression and alcoholism. Apparently, he was a big scary guy, threatens to beat up a coworker at a sales meeting. As soon as he finds out that Human Resources is investigating his behavior, he goes and checks into a rehab and face it. He even has doctor's notes sent to the employer telling them that he's cleared to come back to work. He wants to come back to work. He's cleared. There's clear knowledge that there's a covered disability here. They still fired him, and the court still reversed the jury verdict in that case. There's a long line of cases that address the simple fact that even if misconduct on the job is a product of or a manifestation of the disability, that doesn't shield the employee from it. Right, I recognize that. So you say it's because of the conduct. The other side says it's because of the condition. Since that goes, maybe it goes back to Judge Southwick's question. But in looking at what the intent was, what's the framework? I mean, would we still engage in a pretext analysis where the plaintiff could show, well, sure, the company's saying it's the conduct, but this pretext evidence shows that's really not what's going on here. That's a fair question. And a pretext analysis, which was done in this case as well, certainly can be applicable to this type of situation. And I think, again, that's going to be fact-specific. But if we had situations where you had someone with Tourette's and that person's manifestation was limited to spewing out vulgarities and you had a workplace where everybody was doing it anyway, but you fired them, that would be one thing. There's no such evidence. But you just said pretext would be fact-specific. Are you saying we need to send this case back to a jury? No, I don't believe there's any real— But that's why I could not tell with the answer that you just were giving that it was pretext and that was fact-specific. Maybe I'm mischaracterizing. I'll blame that on poor microphone or poor acoustics. But, no, actually there's a substantial argument lodged by the appellant's pretext. We believe that there really is no material fact issue raised that would establish any pretext in this case whatsoever. But you do recognize as a general matter pretext can be applied to this, see whether it's motivated by conduct versus condition. Of course, Judge, absolutely. So let's address the pretext because the arguments that they make simply don't create a legitimate, genuine fact issue here. But when you compare it to something like they cite, the well-known Laxton case, the Laxton versus the Gap, where almost every reason given by the employer for the adverse employment action was shot down and particularly important was the language in that case where the evidence of pretext combined with mendacity certainly had something to do with it. I'm even recalling that there was a situation where the individual who fired the plaintiff in that case claimed he didn't know she was pregnant and she was very visibly pregnant in person meeting with him when she was fired. If you look at it in this case, there are several lines of attack they use to establish pretext. The first is they say, they quote Justice Alito from the Young case saying that if the assertive reason just doesn't make sense, you can conclude that it's a possible pretext. They didn't finish the statement that Judge Alito issued in that case. And he goes on to say, but if the finder of fact can conclude that it was the right reason, then that's fine. Again, without being flipped, does it make sense to whom? It may not make sense to Ms. Harkey. She may feel like it was no big deal. Her testimony is in the record where she said, I think Mr. O'Donnell was really making too big a deal of it. Oh, I'm freaked out. I want to go home. I want to get out of here. And she says, but that's just me. Certainly the intent issue is important here. The record is clear. Mr. O'Donnell's testimony is in the summary judgment record. And he said he was freaking out because this happened to be at the time of the Me Too movement, relatively newly married compared to some of us five years married. How was he going to explain this if it came up with his wife? Clearly, Ms. Burke's questioning of him raised concerns because, face it, I think it's not beyond the pale that somebody in HR may say, what's going on here? Did these two people hook up in the bar and then somebody passed out? This is behavior that we don't want to have going on here. And so when you look at it, it makes perfectly good sense from the standpoint of a company saying, you can be a liability if you go walking in somebody's room like this. And so I think that doesn't indicate any pretext whatsoever. Failure to follow policy. The policy they point out is the progressive discipline policy. That was easily addressed. You can skip steps if you think it's egregious. And Ms. Burke testified that she did think so. They raised the issue of lack of contemporaneous documentation. This is more really just quibbling. There were documents created by Ms. Burke of her interviews with coworkers. The fact that she didn't document her conversation with her superior where the suggestion of discharge was made is really meaningless. The cases cited by the plaintiffs in this situation, the appellant, are all cases where an employer was trying to rely on a long history of poor performance but didn't have any documentation of it prior or where, in some cases, they even manufactured documentation after the fact. There's no evidence of that here whatsoever. The issue of inconsistent or wrong statements to governmental agencies. They're fighting over the definition of tipsy versus very tipsy. I don't think that this case should really turn on trying to have gradations of how drunk you are. Certainly there was questioning about how much drinking Ms. Harkey had been doing that evening. She questioned Mr. O'Connell about it as well. That's in the record. Ms. Harkey was not fired for being drunk on the job she was fired for, and it was very clear in the record. It's on page 113 of Ms. Burke's deposition. I fired her or recommended the firing because she walked into somebody's room uninvited, and I think that that's egregious and severe conduct that merits discharge. I'll just say this. There's a long line of cases in the Fifth Circuit that address the kind of evidence that really creates pretext. There's a ton of them. Mayberry, Sonstad, all of those. I think that, Judge Southwick, you stated it best in the Delaval case, where you say management's decisions, they don't have to be right. They just can't be discriminatory. That's the truth because, face it, again, the courts are well known as saying that they don't want to be a super-personnel department, and that's exactly what the appellant in this case is asking you to do. Finally, on the mixed motive issue, we don't believe that that really is an issue at all for a couple of reasons. Number one, really to have a mixed motive instruction, you should have direct evidence, and there is no direct evidence in this case. Number two, even if mixed motive instruction or consideration was appropriate, we believe that the summary judgment evidence clearly establishes a legitimate reason to discharge misarchy and doesn't really indicate anything of a nature that should be considered direct evidence. If there are no further questions, I will yield the remaining 15 seconds of my time. Thank you. Thank you. I want to begin by addressing Judge Southwick's question about is this a question of law or is this a fact question. The reason that this is a fact question is because of the specific evidence before this court and the company policy itself. In Hamilton, you have a situation where there is no way you can view what this man did as anything other than workplace violence. You can't view smacking a coworker, yelling at them, yelling expletives. You can't view that as anything other than violence. In this case, there were several other factors to be considered, and the specific ones, isolated in nature, ameliorative effects, mitigating circumstances, and that's not alone. That's not alone the reason it's a fact question, but in conjunction with everything else. I heard opposing counsel tell you that the liability could have just meant that behavior could be a liability. That's not the standard on summary judgment. We get the inference. We get the benefit of all reasonable inferences. Truly, for NextGen to be entitled to summary judgment, they would have had to come up here and say, yes, even if she said you're a liability because of your condition, yes, even if she told her to see a doctor, yes, even if she sought to exaggerate all of the other facts, even then we win. But that's not what NextGen said. That's not what they can say. I found it stunning that he said that there's no personal impact on her because of her condition. She lost her job, your honors. The question of apparently this condition can be so transitory and minor yet be severe enough for her to be terminated, those two arguments do not make sense when you view it through the prism of the mandated standard and when you view the evidence together. There's actually one thing opposing counsel said that I agree with. Sleepwalking is a fact question. Whether her condition substantially impairs this major life activity, the prima facie case is not an onerous burden. She brought enough to the table to be entitled to a jury question. As the Seventh Circuit said in Felton, which is another sleep disorder case, it doesn't matter if it maybe isn't as serious or maybe the employer has evidence that it's not as serious. The question is what is on the other end of the scale? And I respect that this court does not want to discuss the district court's errors because the review is de novo, but by and large that's our entire issue is instead of looking at what was on Ms. Harkey's end of the scale, it was all about let's believe NextGen, let's take NextGen's evidence for fact, let's cite NextGen's motion for summary judgment almost 20 times and not even supporting evidence and let's apply outdated standards with respect to what constitutes a disability. Now I have nothing but respect for the summary judgment procedure. I use it, I utilize it frequently, but it is limited to certain situations. And Ms. Harkey today, for this court, I'm sorry, Your Honor, were you going to speak? For this court to reverse this case, it does not have to rewrite any existing precedent, it just needs to apply the laws with respect to summary judgment standard in the ADA. It does not have to extend Hamilton, which in this case a fact issue has been raised, but for the court to affirm summary judgment principles would have to be rewritten, there would have to be an extension of misconduct in the workplace cases to include non-conscious action, and it would just be a very devastating impact allowing an employer to continue to chip away at ADA protections instead of following the ADA Amendments Act's mandate, which is the prima facie case isn't onerous, substantially impaired is not a demanding standard, nor did the employer comply with the ADA. And ultimately, as I mentioned before, Ms. Harkey isn't asking this court to say, you win. She is asking to be able to stand in front of a jury of her peers and explain what happened to her. This is not the first time that this court has reversed a district court for not complying with the summary judgment standard. This court did it in Cannon, this court did it in Burton, this court did it in Williams, and we are only asking that this court reverse so Ms. Harkey can have her day in court, and when the court looks at all of the evidence through the mandated summary judgment standard, it's clear that reversal is mandated here. And unless the court has any other questions, I yield the remainder of my time. Well, 28 seconds of it. All right, counsel, thanks to you both. Thank you, your honors. That concludes our arguments for this week on this panel. We have a few more ahead, so I guess we are only in recess.